THIS EXCLUSIVE BOTTLING AND DISTRIBUTION AGREEMENT (this "Agreement") effective as of June 1, 2007 (the "Effective Date"), is made and entered into by and between ROYAL SIGNATURE INC., AVENIDA BALBOA, CENTRO COMERCIAL PLAZA PAITILLA, OFICINA 61 A, PRIMER ALTO PANAMA, PANAMA a corporation organized and existing under the laws of Panama (the "Company"), and BROOKLYN BOTTLING OF MILTON, NEW YORK, INC., a corporation organized and existing under the laws of the State of New York, having its principal place of business in Brooklyn, New York (the "Bottler").

## WITNESSETH:

WHEREAS

A.  The Company manufactures and sells the concentrates (the "Concentrates") for the manufacture of finished beverage products identified or described as "Beverages" on Schedule A (the " Beverages").

B.  The Company is the owner or authorized licensee of the trademarks identified on Schedule B (together with such other trademarks as may be authorized by the Company from time to time for current use by the Bottler under this Agreement, the "Trademarks"), which, among other things, identify and distinguish the Beverages;

C.  The reputation of the Beverages as being of consistently superior quality has been a major factor in stimulating and sustaining demand for the Beverages, and special technical skill and constant diligence on the part of the Bottler and the Company are required in order for the Beverages to maintain the excellence that consumers expect; and

D.  The Bottler wishes to manufacture, distribute and sell the Beverages in the Territories set forth in Schedule C on an exclusive basis, subject to the provisions herein.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Bottler agree as follows:

## ARTICLE I
### The Authorization

1.
   a) The Company authorizes the Bottler, and the Bottler undertakes to manufacture, package, distribute and sell the Beverages under the Trademarks in and throughout the Territories (as hereinafter defined).

   b) The Company appoints the Bottler as its sole and exclusive purchaser of the Concentrates for the purpose of manufacturing, packaging, distributing and selling the Beverages in the

1

Exhibit "1"

packages approved by the Company under the Trademarks in the Territories. The Company further appoints Bottler as the sole and exclusive manufacturer, packager, distributor and seller of the Beverages in the Territories, including any brand extensions or other beverage products introduced for sale into the Territories by the Company; and on a non-exclusive basis in Territories indicated as such on Schedule C.

c) "Territories" means each of the sub-territories identified on Schedule C.

## ARTICLE II
### Obligations of Bottler
### Relating to Trademarks and Other Matters

2. The Bottler acknowledges and agrees not to question or dispute the validity of the Trademarks or their exclusive ownership by the Company. By this Agreement, the Company grants to the Bottler an exclusive license to use the Trademarks solely in connection with the manufacture, packaging, marketing, distribution and sale of the Beverages in the Territories. The Company represents and warrants that it possesses all rights in the licensed Trademarks to grant Bottler the license(s) granted herein. Nothing herein, nor any act or failure to act by the Bottler or the Company, shall give the Bottler any proprietary or ownership interest of any kind in the Trademarks or in the goodwill associated therewith. The Bottler acknowledges that several other bottlers and/or sellers have been using the Trademarks without the consent of the Company, and as a result the Company may have waived some or all of the rights in the Trademarks or be stopped from asserting them against such other users.

## ARTICLE III
### Obligations of Bottler Relating to
### Manufacture and Packaging of the Beverages

3. The Bottler represents and warrants that Bottler currently possesses, and will maintain during the term of this Agreement, such plant or plants, machinery and equipment, trained staff, and distribution facilities as are capable of manufacturing, packaging and distributing the Beverages in accordance with this Agreement, in compliance with all applicable material governmental and administrative requirements, and in sufficient quantities to fully meet the anticipated demand for the Beverages in the Territories,

4. The Bottler recognizes that increases in the demand for the Beverages, as well as changes in the packaging used for the Beverages, may, from time to time, require adaptation of its existing manufacturing, packaging or delivery equipment or the purchase of additional manufacturing, packaging and delivery equipment. The Bottler agrees to make such reasonable modifications and adaptations as Bottler and the Company agree are necessary to maintain quality standards and to fully meet the demand for the Beverages in the Territories. Notwithstanding anything herein to the contrary, the Bottler shall not be required to use any new packaging for Beverages or undertake capital improvements unless the Bottler in its discretion approves such new packaging or capital improvements.

U.S. Food and Beverage ("CPI") increase since the date the then current Yield Cost amount where set (but not as of a date earlier than the Effective Date).

b) The Company shall deliver the concentrate FOB as defined in Incoterms 2000, to the international carrier in Ecuador. Title to the Concentrate and risk of loss shall pass to the Bottler upon delivery to the international carrier. The Bottler shall be responsible for loading the Concentrate on the international carrier's transport, if required by the international carrier. All other costs of transfer to the Bottler's plant including, without limitation, freight, insurance, transfer, shall be arranged by the Bottler.

11.
a) The Company agrees not to directly or indirectly sell any Beverages in the Territories to anyone other than the Bottler and further, not to authorize any other bottlers or distributors of Beverages in the Territories so long as this Agreement is in effect. The Bottler shall not knowingly distribute or sell any Beverages to any person for ultimate sale outside the Territories. The Company shall not knowingly distribute or sell or permit any of its other distributors, bottlers or co-packers to distribute or sell any Beverages to any person in, or for ultimate sale in the Territories. For the purposes of this paragraph, and in the instance of a customer reselling the Beverages for eventual

6

sale outside of the Territories or other indirect sales (not by Bottler), the Bottler shall not be considered to have knowingly transshipped the Beverages unless (i) the Company or another party shall have provided Bottler with notice that such customer is reselling the Beverages outside of the Territories and (ii) the actual Beverages that are the subject of such transshipment were sold by Bottler to such customer after Bottler received notice that such customer was reselling the Beverages outside of the Territories; provided, further that under no circumstances shall multiple resales outside of the Territories by a customer of Bottler be deemed to constitute more than one knowing transshipment by Bottler. If within any calendar year more than one hundred physical (100) cases of any Beverages distributed by any party (for this purpose, any Beverage distributed or sold by any person other than Bottler), in violation of this paragraph, then such party shall be deemed to have transshipped such Beverages and shall be deemed to be a "Transshipping Bottler" for purposes hereof. For purposes of this Agreement, "Offended Bottler" shall mean the Company or the Bottler, as the case may be, into whose territory (as such term is used above in this paragraph 11(a)) the other is deemed to have transshipped any Beverages under this paragraph 11(a).

b) The Offended Bottler may impose upon the Transshipping Bottler a charge for each 12 oz. unit of Beverages transshipped by such Transshipping Bottler. The initial unit amount of such transship charge shall be $6.50 per 288 oz. case. Any adjustments to this amount shall be determined by the Company in its sole discretion and it shall give the Bottler at least 30 days advance written notice before such change becomes effective, provided, however that any increases shall not exceed the cumulative CPI increase since the date the then current transship charge was set. The Company and the Bottler agree that the amount of such charge shall be deemed to reflect the damages to the Offended Bottler. In addition the Offended Bottler may directly charge the Transshipping Bottler the full amount of all reasonable investigative and other costs incurred in connection with the transshipment and such Transshipping Bottler shall be obligated to pay such amount. If the Company or its agent recalls any Beverage which has been transshipped the Transshipping Bottler shall in addition to any other obligation it may have hereunder (but without duplication of its obligations under paragraph 7(c) reimburse the Company for its costs of purchasing, transporting, and/or destroying such Beverage.

c) The Company agrees that the procedures and penalties for transshipping set forth herein do and shall apply to all other bottlers and distributors of the Beverages and will be enforced by the Company so as to entitle Bottler to the same protections in the event Beverages sold by a third party are transshipped into the Territories and to discourage any transshipping by other bottlers and distributors. The Company and the Bottler will give each other notice of any suspected transshipping and will cooperate in taking appropriate commercially reasonable measures to try to reduce or eliminate transshipping to the extent practicable.

7

d) The Company shall implement a system to cause the labels on packages for Beverages to identify the distributor of that Beverage so as to enable the parties to effectively monitor and detect transshipping.

## ARTICLE VI
### Obligations of the Bottler
### Relating to the Marketing of the Beverages
### Financial Capacity and Planning

12.

a) The Bottler shall fully cooperate in all cooperative advertising and sales promotion programs and campaigns that may be reasonably established by the Company for the Territories. The Bottler will use and publish only such advertising promotional materials or other items bearing the Trademarks relating to the Beverages as the Company has approved and authorized. Unless the Company agrees in advance, Bottler's annual advertising and marketing spending related to promotion and sale of the Beverages shall be not less than two (2%) percent of Bottler's gross annual sales of the Beverages for the preceding calendar year and notwithstanding anything in this Agreement to the contrary, the Bottler shall not be required to spend more than such amount. The Company may in its sole discretion, contribute to such expenditures. The Company may also undertake, at its expense and independently of the Bottler's marketing programs, any advertising or promotional activity that the Company deems appropriate to conduct in the Territories, but this shall in no way diminish Bottler's responsibility for promoting the sale of the Beverages in the Territories.

b) The Company agrees, at the Bottler's request, to assist the Bottler's promotional efforts relating to the Beverages by assisting the Bottler in locating and purchasing, at Bottler's expense, Ecuadorian hats, shirts, and other promotional items.

## ARTICLE VII
### Reformulation, New Products and Related Matters

13. The Company has the sole and exclusive right and discretion to reformulate any of the Beverages. In addition, the Company has the sole and exclusive right and discretion to discontinue any of the Beverages under this Agreement. In the event that the Company discontinues any Beverage, Schedules A and F to this Agreement shall be deemed amended and the minimum volume requirements for the category of Beverages on Schedule F in which that discontinued Beverage is included shall be equitably adjusted to take into account the discontinuation of such Beverages.

## ARTICLE VIII

8