UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                       :

IN RE SEPTEMBER 11TH LIABILITY     :    **OPINION AND ORDER GRANTING**
INSURANCE COVERAGE CASES          :    **SANCTIONS FOR PLEADINGS AND**
                                :    **DISCOVERY ABUSES**
                                :
                                :    03 Civ. 332 (AKH)
                                :
------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        This opinion and order imposes sanctions against Zurich American Insurance

Company, the law firm of Wiley Rein LLP, and the law firm of Coughlin Duffy LLP, jointly and

severally, for their acts and omissions in this litigation. I write to explain why sanctions are

imposed.

**I.**    **Background**

    A.  Origins of the Consolidated Litigation and the Motions for Sanctions

        In July 2001, the Port Authority of New York and New Jersey ("Port Authority"),

the owner and operator of the World Trade Center, entered into lease agreements with real estate

developer Larry A. Silverstein, and with Westfield Corporation, Inc. ("Westfield")—Silverstein,

for the leasing of the twin towers of the World Trade Center, Towers One and Two; and

Westfield, for the leasing of the retail space in the concourses and street levels of the towers.

Silverstein formed subsidiary companies and, eventually, limited liability entities to lease

Towers One and Two and two additional office buildings in the World Trade Center complex,

buildings Four and Five; Westfield formed a limited liability entity to lease the retail space.

        The lease agreements were contingent on procuring insurance. Silverstein formed

World Trade Center Properties LLC ("WTCP") to hold the individual leasing entities, and

obtained binders from Zurich American Insurance Company ("Zurich") for a primary

**MEMORANDUM – EXHIBIT 1**

Commercial General Liability Policy.  As of September 11, 2001, Zurich's binders constituted

the insuring agreement, <u>see</u> <u>SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC</u>, 467 F.3d 107

(2d Cir. 2006), along with various excess and reinsuring agreements creating a tower of one

billion dollars of aggregate coverage.  <u>See</u> <u>In re Sept. 11th Liab. Ins. Coverage Cases</u>, 458 F.

Supp. 2d 104, 111 (S.D.N.Y. June 8, 2006) (describing tower).  The Zurich binder identified

"Silverstein Properties, Inc./World Trade Center" as the "Named Insured."

 Following the September 11, 2001 attacks, the legal successors of many of those

who died, and many of those who were injured or suffered property damage, brought suit to

recover damages for breaches of duties of care owed to the decedents and the injured.  These

underlying cases named multiple defendants, including the Port Authority and WTCP.  In

January 2003, WTCP brought a third-party action against Zurich for declaratory relief regarding

Zurich's obligations to WTCP and to other parties.  Zurich responded by filing a fourth-party

action and an original complaint against WTCP, the Port Authority, and Westfield, among

others, raising the same issues and asserting that neither Westfield nor the Port Authority was

entitled to insurance coverage.  The third- and fourth-party actions were consolidated for pretrial

proceedings in <u>In re September 11th Liability Insurance Coverage Cases</u>, 03 Civ. 0332 (AKH).

 The issues regarding the Port Authority's and Westfield's insurance status were

vigorously litigated in motions and discovery proceedings and at conferences.  Ultimately,

Zurich abandoned its contentions as to the insured status of the Port Authority and Westfield, but

not until its contentions prevented the Port Authority from prevailing on a Rule 12(c) motion,

requiring extensive discovery proceedings to explore the issues of fact raised by Zurich's denials

and defenses.  WTCP, the Port Authority, and Westfield each contended, also, that Zurich had an

obligation to defend them in lawsuits, but as to these issues, and after extensive discovery, I

upheld Zurich's position.  See In re Sept. 11th Liab. Ins. Coverage Cases, 458 F. Supp. 2d 104.

In addition, one large issue remained undecided: the scope of Zurich's liability insurance

obligations in relation to the particular bases of suits and recoveries by the plaintiffs in the

actions and in relation to other insurance.  The parties urged me to postpone these issues until

after the underlying litigations proceeded further or became resolved; I agreed, and the result was

a dismissal of these issues without prejudice to later assertion.  See Order Dismissing Claims for

Mootness (Jan. 18, 2007).

    Following dismissal, and consistent with procedures that I had established in

previous case management orders, see Order Regulating Claims for Sanctions Pursuant to Rules

11 and 37, Fed. R. Civ. P. (Jan. 10, 2007), the Port Authority and Westfield both moved for

sanctions pursuant to Rules 11 and 37 of the Federal Rules of Civil Procedure.  They allege that

the positions that Zurich took in its pleadings, motions, and other papers were objectively

unreasonable, in violation of Rule 11, and that Zurich produced certain documents much later

than they were required to produce the documents, and destroyed other documents, in violation

of Rule 37.  These allegations require the Court to consider what Zurich and its lawyers knew,

when they knew it, and whether such knowledge rendered their pleadings, motions, and conduct

during discovery subject to sanctions.  The parties submitted extensive documentation in support

of their respective positions.  From these submissions, a more detailed picture of the parties'

relationships and of their interactions has emerged.

    B.  The Zurich Insurance Negotiations

    Having successfully negotiated to lease the World Trade Center properties from

the Port Authority in early 2001, but requiring insurance to complete the leasing and administer

the leased properties, Larry Silverstein asked an insurance broker, Willis of New York, Inc.

("Willis"), to obtain coverage for the properties.  Similarly, Westfield, in order to complete its

leasing of the retail space from the Port Authority, asked its insurance broker, Marsh Risk &

Insurance Services ("Marsh"), to obtain coverage for its needs.  Although Westfield leased the

retail portion of the World Trade Center from the Port Authority independently of Silverstein,

Silverstein became responsible for obtaining insurance also for Westfield.  See Part I.C., infra.

Thus Craig Simon of Willis entered into discussions with Zurich to obtain coverage both for the

Silverstein interests, and for Westfield.  Zurich contends that it was not advised that insurance

arrangements for Westfield were required as part of the Silverstein/Port Authority package;

Westfield disagrees.

        In April 2001, Simon contacted Dennis Zervos, Zurich's Vice President of Global

Corporate Customer Casualty.  In one of the first conversations between Simon and Zervos,

Simon mentioned Westfield in connection with the World Trade Center.  Zervos's handwritten

notes of the conversation include the phrase "Westfield – Retail – Out of Chicago."  Declaration

of Sheri E. Hametz, February 9, 2007 ("Hametz Decl."), Ex. 1.  On June 8, 2001, Simon sent his

requested insurance specifications to Zervos.  Westfield was not mentioned in Simon's

specifications, and Simon did not receive input from Marsh, Westfield's broker, before his

submission to Zervos.  See Hametz Decl., Ex. 3 (Willis specifications); Declaration of Robert J.

Kelly, March 19, 2007 ("Kelly Decl."), Ex. 11 (deposition of Cynthia Glist, Marsh

representative).  Zervos delivered the specifications to underwriter Lynn Maier and Maier's

underwriting assistant, Gladys Fonseca-Matos, who used the specifications to calculate the

premium for the requested coverage.  See Hametz Decl., Exs. 5–6.  From Fonseca-Matos's notes

on the Willis specification, referring to both a "building lessor" and a "retail lessor," see Hametz

Decl., Ex. 6, I infer that the premium comprehended both the Silverstein interests and the

Westfield interests.

On July 10, 2001, Lynn Maier gave Zurich's premium quotation for liability coverage to Simon. Nancy Townsend, director of risk management at Westfield, reviewed the quotation and raised several concerns with Simon. She also asked that Willis cause certificates of insurance to issue to Westfield. See Hametz Decl. Exs. 10–11. Simon replied to Townsend on July 17, 2001 and, copying Maier of Zurich, said that certificates would be provided, as Townsend had requested. Hametz Decl., Ex. 10.

On July 18, 2001, Zurich issued an insurance binder containing the terms of liability coverage for the World Trade Center properties. The binder initially listed the Named Insured as "Silverstein Properties, Inc./World Trade Center." Hametz Decl., Ex. 13. Under the heading "Coverage Extensions/Exclusions," the binder listed over a dozen endorsements,[1] including a "Named Insured" endorsement, an "Additional Insured Where Required Under Contract" endorsement, and an "Additional Insured – Managers or Lessors of Premises" endorsement. The July 18, 2001 insurance binder did not attach the actual endorsements, but stated, instead, that "Zurich wording will be used for all manuscript endorsements."[2] Id. On July 24, 2001, Willis sent a fax to Zurich's primary and umbrella underwriters requesting that Zurich amend the Named Insured on the policy to "World Trade Center Properties LLC," see Kelly Decl., Ex. 4, a change that Zurich accepted, see Zurich Opp. to Westfield Mot. at 17. Thus, WTCP became the Named Insured in Zurich's insurance binder.

---

[1] An endorsement, or rider, is attached to, and becomes part of, the insurance contract. A policy's endorsements are ordinarily referenced in the policy declarations section of the contract. See 4-20 Appleman on Insurance § 20.1.

[2] A manuscript endorsement is negotiated, drafted, and attached to the insurance contract for the benefit of a specific insured. By contrast, a "standard-form" policy's provisions are generally available. See BARRY R. OSTRAGER & THOMAS R. NEWMAN, 1 HANDBOOK ON INSURANCE COVERAGE DISPUTES § 1.03[c][4] (13th ed. 2006); Lewis Aff., Ex. 12 (deposition transcript of Fonseca-Matos, testifying that Zurich personnel created "Broad Form Named Insured Endorsement" by typing information into blank Coverage Change Endorsement).

C.  The Lease Agreements

The Zurich insurance binder identified the Named Insured as "World Trade Center Properties LLC," but "World Trade Center Properties LLC" was not itself a lessee of any of the subject properties.  The entities that became lessees to the several towers of the World Trade Center, and to the retail space within the towers and concourse levels (the "Net Lessees"), were subsidiaries of holding companies controlled, respectively, by WTCP and by Westfield.[3] By lease agreements dated July 24, 2001, each of the lessees controlled by WTCP (the "Silverstein Net Lessees") agreed to obtain insurance that would extend to the Port Authority and to the Port Authority Trans-Hudson Corporation ("PATH").  See Affidavit of Joan L. Lewis, February 9, 2007 ("Lewis Aff."), Ex. 1 §§ 14.1.4, 14.3.  By separate agreement as of the same day, July 24, 2001, among the Silverstein Net Lessees and Westfield WTC LLC, the Westfield lessee of the retail space—the Restated Reciprocal Easement and Operating Agreement of Portions of the World Trade Center—the Silverstein and Westfield entities formed a "Net Lessees' Association," and provided that the Net Lessees' Association had the obligation to obtain liability insurance for the member lessees, including the Westfield net lessee.  See Hametz Decl., Ex. 8 § 8.1(a)(iii).  Thus WTCP, as the Silverstein holding company that controlled both the Silverstein Net Lessees and the Net Lessees' Association, sought insurance from Zurich and

---

[3] On April 17, 2001, Silverstein formed four Delaware limited liability companies—the Silverstein Net Lessees—to hold the leases to the respective towers of the World Trade Center.  The Silverstein Net Lessees are 1 World Trade Center LLC; 2 World Trade Center LLC; 4 World Trade Center LLC; and 5 World Trade Center LLC.  To obtain mezzanine financing, on July 10, 2001, Silverstein formed four additional limited liability companies to serve as borrowers:  1 World Trade Center Holdings LLC; 2 World Trade Center Holdings LLC; 4 World Trade Center Holdings LLC; and 5 World Trade Center Holdings LLC.  On July 20, 2001, World Trade Center Properties LLC transferred all of its membership interest in each of the Silverstein Net Lessees to the corresponding limited liability holding company.  World Trade Center Properties LLC—WTCP—became the sole member of each of the limited liability holding companies, and retained control of the Net Lessees.  See Lewis Aff., Ex. 23 (WTCP submission describing leasing entities and their controlling members); see also In re Sept. 11th Liab. Ins. Coverage Cases, 458 F. Supp. 2d at 108–09 & n.1.  Similarly, Westfield formed Westfield WTC LLC (n/k/a WTC Retail LLC) and Westfield WTC Holding LLC to operate as the retail Net Lessee and member holding company.

the excess insurers to protect the Silverstein Net Lessees, the Westfield lessee, the Port

Authority, and PATH.

        However, the insurance binder issued by Zurich on July 18, 2001 identified

"Silverstein Properties, Inc./World Trade Center" and then, as amended on July 24, 2001,

"World Trade Center Properties LLC" as the Named Insured, and not the Net Lessees.  Zurich,

in consequence, took the position that because the Net Lessees were not named as Insured, the

Port Authority and Westfield could not be Additional Insureds, for they did not have contractual

relations with WTCP.  Consistent with that position, Zurich asserted that the endorsement,

"Additional Insured Where Required Under Contract," was not effective to extend Additional

Insured coverage to the Port Authority and Westfield, because the entity that was insured,

WTCP, did not have a contractual obligation to procure coverage for the Port Authority or

Westfield.  Similarly, Zurich denied coverage under the endorsement, "Additional Insured –

Managers or Lessors of Premises," for the Port Authority was the lessor of the Net Lessees, and

not the lessor of the Named Insured, WTCP.  See Lewis Aff., Ex. 17 ¶¶ 13, 14 (Zurich's First

Amended Complaint).

        D.  The Insurance Policy Within Zurich's Computer System on September 11, 2001

        On the day of the terrorist attacks, Zurich's chief underwriter for the United

States, Mary Merkel, asked her assistant to print a copy of the then-existing primary policy from

the computer system Zurich uses to generate its policies.  She retained the print-out, a 62-page

document (the "9/11 Document"), in her files in Schaumberg, Illinois.  The 9/11 Document, and

the specific wording of the endorsements that were part of the 9/11 Document, contradict

Zurich's contention that the Net Lessees, excepting Westfield, were not Named Insureds under

the Policies.  In particular, the 9/11 Document contained a "Broad Form Named Insured"

endorsement that listed as named insureds:

World Trade Center Properties, LLC c/o Silverstein Properties, Inc. and any subsidiary company as now formed or constituted, and any other company over which the named insured has active control so long as the named insured or any subsidiary company has an ownership interest of more than 50% of such company.

Hametz Decl., Ex. 15 (all caps in original) (emphasis added). Because the Net Lessees, excepting Westfield, were WTCP subsidiaries or controlled by WTCP, the Broad Form Named Insured endorsement would give them "Named Insured" status, which, in turn, would confer "Additional Insured" status on the Port Authority. And because WTCP had active control over the Net Lessees' Association, and owned four of the Association's five members, the Broad Form Named Insured endorsement likely conferred "Additional Insured" status on Westfield, as well.

In March 2003, Zurich's attorneys took possession of the 9/11 Document, or a copy, from Mary Merkel's office. See Platt Decl. ¶ 3. An associate at Wiley Rein LLP, Zurich's lawyers then responsible for Zurich's representation before me, reviewed the Merkel documents, but did not report the existence of the 9/11 Document to a supervising partner, or so Wiley Rein partner Leslie Platt represents. See id. ¶¶ 3, 4. Platt stated also that Zurich's lawyers, presumably including Platt, did not consider Mary Merkel's files part of the "underwriting files" relevant to discovery, even though Ms. Merkel was chief underwriter for the United States. See id. ¶¶ 4, 5. The document was not produced until February 18, 2005, after depositions had been completed and following pointed inquiries by opposing counsel, following up trace references in other of Zurich's productions.

E.  From September 11, 2001 to Zurich's First Amended Complaint

Zurich knew, from the catastrophic damage to life and property caused by the terrorists on September 11, 2001, that Zurich would need to respond to claims on its policy, and potentially litigate such claims. Zurich's privilege log reflects that it recognized this possibility

8

on November 6, 2001, <u>see</u> Hametz Decl., Ex. 18 at 148, but one may infer that Zurich had to recognize the possibility almost simultaneously with the event.

On November 16, 2001, Zurich issued its full, post-binder, primary liability insurance policy. The policy issued on that date by Zurich did not include either the "Additional Insured Where Required By Contract or Agreement" endorsement referenced in the July 18, 2001 binder; nor the "Broad Form Named Insured" endorsement that was part of the 9/11 version of the policy that had been printed for Mary Merkel. <u>See</u> Lewis Aff., Ex. 13. The policy that Zurich issued on November 16 contained a different endorsement, the "Additional Insured – Managers or Lessors of Premises" endorsement. This endorsement provided, albeit with some ambiguity, that the Port Authority was an Additional Insured, and that the insurer could not invoke any defense based on the Port Authority's governmental immunity without the Port Authority's express permission. The endorsement also stated that it did not limit or change the Port Authority's protections under the contractual liability endorsement. <u>See</u> <u>In re Sept. 11th Liab. Ins. Coverage Cases</u>, 333 F. Supp. 2d 111, 122 (S.D.N.Y. 2004).

On January 7, 2002, Thomas W. Brunner, a partner at the law firm of Wiley Rein LLP, then known as Wiley Rein & Fielding LLP, who became the lead lawyer for the insurance companies in the case before me, met with primary liability and excess liability underwriters and instructed that "all communications relating to [the] situation should be preserved, including communications that would be discarded in the ordinary course of business." Brunner Decl. ¶ 2, 5. However, on January 11, 2002, four days later, Zurich underwriter Lynn Maier sent an email to underwriting assistants Dorothy Kelly and Gloria Fonseca-Matos, and to her supervisor, Dennis Zervos, instructing an important exception concerning the version of the policy printed out on September 11, 2001 for Mary Merkel. Maier's email stated in relevant part:

> As per our conversation, please confirm ASAP, that the old version of the policy has been deleted from the Document Library and replaced with the final corrected policy. This information needs to be relayed to Mary Merkel in home office.

Hametz Decl., Ex. 21.  On January 22, 2002, claims representative William Salvatore sent an email to two other representatives, inquiring:

> Do you have a copy of the Silverstein / WTC GL policy from the document library, not the copy we provided but a copy you may have printed way back when?

Hametz Decl., Ex. 22.

In 2002, the Silverstein entities began to file notices of claims with Zurich.  See Hametz Decl., Ex. 23.  On January 14, 2003, following disputes by Zurich over the status and scope of its coverage, WTCP commenced a third-party action against Zurich for declaratory relief, and the following day, January 15, 2003, Zurich filed its first complaint for declaratory relief against WTCP, the Port Authority, Westfield, and various excess insurers.  In the spring of 2003, the parties attempted to mediate their differences, and produced documentation in support of their opposing claims, including the lease agreements and the Restated Reciprocal Easement and Operating Agreement.  See Sanctions Hearing Tr. 36, 42, 46, 50, 67 (Apr. 19, 2007); Lewis Aff., Ex. 17 ¶ 107.  Zurich and its lawyers knew from the spring 2003 production, if they had not learned it previously, that the actual lessees of the premises was not WTCP, but the Silverstein Net Lessees, and that Silverstein, or entities controlled by Silverstein through the Net Lessees' Association, was contractually obligated to procure insurance for Westfield.  See id.

F.  Zurich's First Amended Complaint and the Port Authority's Motion

The facts of the true identities of the lessee, although made clear to Zurich during mediation in the spring of 2003, did not cause Zurich to change its position that the Port Authority and Westfield were not entitled to coverage as Additional Insureds under the policy

endorsements.  On July 7, 2003, Zurich filed an amended complaint, its First Amended

Complaint, identifying the actual lessees of the World Trade Center and acknowledging the

possibility that the Silverstein subsidiaries "would have been included as named insureds under

the Policies had they been properly disclosed" to Zurich.  Lewis Aff., Ex. 17 ¶¶ 13, 120.

However, Zurich alleged, because "[n]either the identities of the Asserted Insureds, nor their

relationship with each other and to the World Trade Center Premises, were disclosed to [Zurich]

during the negotiations prior to issuance of the Policies, or at any time prior to September 11,

2001," id. ¶ 119, and because neither Westfield's nor the Port Authority's relationship to the

World Trade Center was disclosed during the relevant time period for ascertaining the intent of

the parties, neither Westfield nor the Port Authority could enjoy the status of Additional Insureds

under the Zurich policy.

   The Port Authority filed an answer and counterclaims, alleging that the Port

Authority and PATH were "Additional Insureds," and claiming that Zurich had a duty to defend

and a duty to indemnify it in relation to underlying actions arising out of the events of September

11, and that Zurich breached its duty of good faith and fair dealing.  See Lewis Aff., Ex. 18

¶ 167.  Zurich's reply, filed September 22, 2003, again denied that the Port Authority was an

Additional Insured or entitled to "any relief whatsoever."  See Lewis Aff., Ex. 19 ¶¶ 167, 183.

On October 17, 2003, the Port Authority filed a motion for judgment on the pleadings regarding

its status as an Additional Insured, which, as noted above, I denied on March 1, 2004.

  G.  Document Demands and Depositions

   On October 31, 2003, Westfield served Zurich with its First Request for

Production of Documents, requesting "[a]ll documents concerning [Zurich's] Coverage of the

World Trade Center Complex;" "[a]ll documents … concerning the World Trade Center

Liability Coverage program;" "[a]ll documents concerning any Communications on or before

September 11, 2001 … concerning Zurich's Coverage … for any of the Westfield Parties;" and "[a]ll underwriting manuals, claims manuals, and other documents concerning guidelines, policies, practices, or procedures developed or employed by Zurich with respect to underwriting of commercial liability insurance." See Westfield Mem. at 19 (quoting document demands).

Similarly, on November 24, 2003, the Port Authority served Zurich with its First Request for Production of Documents, requesting, among other things, "all versions or drafts of the Zurich Policies, including … any … endorsement" and all documents concerning the drafting, meaning, interpretation or application of key policy terms. See Lewis Aff., Ex. 29 (Doc. Request Nos. 1, 5). The Port Authority also requested all documents concerning the drafting, meaning, interpretation, or application of an endorsement referred to as an "Additional Insured – Managers or Lessors of Premises Endorsement," available to Zurich for use in liability insurance policies, including underwriting and claims manuals. See id. (Doc. Request No. 11).

On January 16, 2004, Zurich produced documents relating to underwriting and claims. Zurich failed to produce Fonseca Matos's notes on the Willis specification, referring to both a "building lessor" and a "retail lessor," or the version of the policy printed September 11, 2001 for Zurich's chief underwriter, Mary Merkel. Zurich did produce the January 11, 2002 email from Zurich underwriter Lynn Maier to Dorothy Kelly requesting confirmation that the "old version" of the policy had been deleted.

The Port Authority complained of an incomplete production, and I convened a status conference on March 2, 2004 to address the parties' discovery disputes, leading to my order, issued the next day, March 3, 2004, ordering the parties to complete all document production in two weeks, by March 19, 2004, and to proceed to the next stage, listing their proposed deposition witnesses. See Lewis Aff., Ex. 31. But, instead of one completed

production in two weeks, before depositions began, Zurich stretched its production to fourteen separate productions and, instead of producing ahead of depositions when the documents would be most useful, delayed production until after depositions were completed.  See Lewis Aff., Ex. 9.  The September 11, 2001 document produced for Chief Underwriter Mary Merkel was not produced until February 18, 2005, almost a year after it was due.

Depositions of Lynn Maier and Dennis Zervos were taken between June and September 2004.  Maier and Zervos both testified that the "Additional Insured – Managers or Lessors of Premises" endorsement established the Port Authority as an Additional Insured.  See Lewis Aff., Ex. 15 (Maier Dep. T. 93–98); Lewis Aff., Ex. 35 (Zervos Dep. T. 78–79).  Maier and Zervos gave contradictory testimony, however, as to whether a "Named Insured" endorsement was customarily used by Zurich at the time and before Willis requested it in July 2001, and at the time Zurich agreed to give it.  Maier testified that she was not aware of any such form in use at Zurich at the time, but Zervos testified that a Named Insured endorsement was in use, and that the endorsement defined the "Named Insured" to include subsidiaries of the Named Insured.  See Hametz Decl., Ex. 1 (Zervos Dep. T. 179, 714).  And in fact, Westfield located a form endorsement that Zurich had filed with the Florida Department of Insurance in 2000, entitled "Broad Named Insured," that was substantially similar to the one contained in the Willis submission.  See Hametz Decl., Ex. 28.

The deposition testimony prompted two concessions on Zurich's part.  First, it revised its pleadings and contentions to reflect that the Port Authority was an Additional Insured under the policy, although it continued to deny that PATH was an additional insured, and the parties continued to dispute the scope of coverage.  See Lewis Aff., Exs. 38–39.  Second, after Westfield confronted Zurich with Zervos's testimony and the Florida filing, Zurich agreed to

produce additional forms, manuals, and guidelines.  On September 29, 2004, Zurich produced a document titled "Named Insured" that discusses when to offer "Broad Form Named Insured" coverage and a document titled "Enterprise Risk:  Standards and Guidelines" on the topic of "Broad Named Insured Wording."  The first document bears a copyright 2003 mark, while the latter indicates that it issued in February of 1996.  See Hametz Decl., Ex. 30.

        In January and February 2005, Zurich produced additional documents from its underwriting files that it had "mistakenly not previously produced" "due to counsel's inadvertence."  See Lewis Aff., Ex. 9 at 7, 11.  Among these documents were the 62-page policy printed for Mary Merkel on the day of the attacks—the 9/11 Document—and the Willis specifications bearing Fonseca-Matos's handwritten notes—the documents which were missing from the initial Zurich productions and the absence of which directly led to the conference that I convened on March 2, 2004 and the order that I issued the next day, ordering production to be completed in two weeks, by March 19, 2004.[4]  But for persistent inquiries by the Port Authority and Westfield attorneys, it appears that these important documents would have not have been produced at all.  See id. at 7.  On March 22, 2005, I ordered Zurich and its attorneys to state the reasons for their late productions, and on April 5, 2005, Zurich produced a log with accompanying explanations.  Lewis Aff., Ex. 9.  Although the Port Authority and Westfield indicated a desire to move for sanctions at that time, I postponed such motions until after the dispositive motions in the case were decided.  See Hametz Decl., Ex. 43.

---

[4] I note that Wiley Rein LLP filed a notice of withdrawal of appearance on February 24, 2005, six days after producing the 9/11 Document.  See Hametz Decl., Ex. 40.

H.  <u>Resolution of the Additional Insured Status Issue and Further Proceedings</u>

It was not until April 13, 2005, that Zurich entered into a stipulation with WTCP agreeing that the Silverstein Net Lessees were Named Insureds under the Zurich policies, and that the Port Authority and PATH were therefore Additional Insureds of the insured parties.

The stipulation between Zurich and WTCP did not mention Westfield WTC LLC, the lessee of the retail mall and the party for which the Net Lessees' Association was contractually obligated to obtain coverage.  Zurich persisted in denying coverage and, on June 16, 2005, Westfield moved for summary judgment.  Six months later, on January 19, 2006, Zurich finally agreed and acknowledged Westfield's status as a Named Insured under the policies.  <u>See</u> Hametz Decl., Ex. 45.  Thus, as of January 2006, the parties finally had resolved the substantive issues of this case, except for one issue, "whether coverage obtained by Silverstein in the Zurich tower provided for defense cost coverage."  <u>In re Sept. 11th Liab. Ins. Coverage Cases</u>, 458 F. Supp. 2d at 111.  The parties briefed that contested issue, and I held that with the exception of one excess insurer, Zurich and the other excess carriers did not agree to extend coverage for defense costs.  <u>See id.</u> at 108.  I deferred judgment on the issue of priority of insurance as among the excess insurers, <u>see id.</u> at 111 n.6, an issue which, by its nature could not be resolved until the facts of the underlying lawsuits were more fully developed.

As 2006 came to a close, Westfield and the Port Authority expressed continued interest in seeking sanctions against Zurich.  With negotiations having failed, I granted Westfield and the Port Authority leave to proceed by motion, and they filed joint motions, as instructed,[5]

---

[5] Zurich's argument that the Rule 11 motions failed to comply with the procedural requirements for bringing such motions, in that they were not made separately from the Rule 37 motions, is without merit.  At a status conference on January 9, 2007, I specifically instructed the parties to file their Rule 11 and Rule 37 applications as one motion. Zurich raised no objection at that time.

seeking sanctions under Rules 11 and 37 of the Federal Rules of Civil Procedure.  On April 19,

2007, the parties appeared for oral argument on the motions, and I reserved decision.

## II.    Discussion

### A.    Standard of Review

#### i.    Rule 11 Sanctions

Rule 11 of the Federal Rules of Civil Procedure governs the conduct of attorneys

in connection with their representations to the court, whether by signing, filing, submitting, or

later advocating a pleading, written motion, or other paper.  Fed. R. Civ. P. 11(b).  Rule 11

provides that an attorney shall not make any representation to the court for any improper

purpose, such as to harass or cause unnecessary delay or needless increase in the cost of

litigation, Fed. R. Civ. P. 11(b)(1); that an attorney shall not assert claims, defenses, or other

legal contentions unless warranted by existing law or by a non-frivolous argument for the

extension, modification, or reversal of existing law or the establishment of new law, Fed. R. Civ.

P. 11(b)(2); that an attorney shall not make allegations and other factual contentions without

evidentiary support unless, if specifically so identified, such contentions are likely to have

evidentiary support after a reasonable opportunity for further investigation or discovery, Fed. R.

Civ. P. 11(b)(3); and similarly, that an attorney shall not deny factual contentions unless the

evidence warrants such denials or unless, if specifically so identified, such denials are based on a

lack of information or belief, Fed. R. Civ. P. 11(b)(4).

By signing, filing, or otherwise representing to the Court that something is or is

not so, the attorney certifies that he has complied with each of the foregoing obligations to the

best of his knowledge, information, and belief, formed after an inquiry reasonable under the

circumstances.  If, after notice and an opportunity to respond, the court determines that an

attorney has not complied with his obligations set forth in Rule 11(b), it may impose an

appropriate sanction on the attorney, law firm, or party that violated or is responsible for the violation.  Fed. R. Civ. P. 11(c).

"The standard for triggering the award of fees under Rule 11 is objective unreasonableness, and is not based on the subjective beliefs of the person making the statement." Storey v. Cello Holdings, LLC, 347 F.3d 370, 387 (2d Cir. 2003) (citation omitted).  "With regard to factual contentions, sanctions may not be imposed unless a particular allegation is utterly lacking in support."  Id. at 388 (citations omitted).  With regard to legal contentions, sanctions may not be imposed unless a particular contention is "patently contrary to existing law, especially as it existed at the time the papers were signed."  Id. at 391; see also Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993) ("As we have repeatedly held, Rule 11 is targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.") (internal quotations omitted).

A baseless factual contention poses a greater threat to justice than a baseless legal contention.  The evidentiary foundation upon which an attorney rests his assertions of fact is, for the most part, exclusively within the control of the attorney and his client.  In order to function, the court must repose trust in the attorneys who come before it to make factual representations supported by evidence.  The legal process contemplates and requires that when the time comes for a judge or jury to find facts, both sides will have legally sufficient evidence to present in support of those facts.  In a complex case, baseless factual contentions can delay the time for presentation of evidence to the fact-finder for years, at an expense running into the millions of dollars.  An attorney who abuses the trust of the court in this manner, and who causes such delay

and needless expense thereby, should be penalized.  In contrast, a misstatement of law is much

more easily remedied, by the adverse party's research, or the court's own research.

    ii.  <u>Rule 37 Sanctions</u>

        Rule 26 of the Federal Rules of Civil Procedure governs the conduct of attorneys

in connection with their disclosures to one another.  The Rule provides that "[p]arties may obtain

discovery by … deposition upon oral examination or written questions; written interrogatories;

production of documents or things" and by other methods.  Fed. R. Civ. P. 26(a)(5).  The scope

of discovery authorized by Rule 26(a) includes "any matter, not privileged, that is relevant to the

claim or defense of any party, including the existence, description, nature, custody, condition,

and location of any books, documents, or other tangible things and the identity and location of

persons having knowledge of any discoverable matter."  Fed. R. Civ. P. 26(b)(1).

        The duty to disclose that arises under Rule 26 does not terminate after the first

responsive answer or production, but is a continuing obligation.  <u>See</u> <u>Zubulake v. UBS Warburg</u>

<u>LLC</u>, 229 F.R.D. 422, 432–34 (S.D.N.Y. 2004) (discussing parties' "continuing" duties under

Rule 26).  In particular, "[a] party is under a duty seasonably to amend a prior response to an

interrogatory, request for production, or request for admission if the party learns that the

response is in some material respect incomplete or incorrect and if the additional or corrective

information has not otherwise been made known to the other parties during the discovery process

or in writing."  Fed. R. Civ. P. 26(e)(2).

        Discovery is run largely by attorneys, and the court and the judicial process

depend upon honesty and fair dealing among attorneys.  Thus the court may impose appropriate

sanctions on a party that, without substantial justification, fails to disclose information required

by Rule 26(a) or 26(e)(2).  <u>See</u> Fed. R. Civ. P. 37(c)(1).  A failure to disclose under Rule 37

encompasses both the destruction of evidence, or spoliation, and untimely production of

documents and information required to be produced.  See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002).  The moving party bears the burden of showing that its adversary failed timely to disclose information required by Rule 26.  To meet this burden, the moving party must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  Residential Funding, 306 F.3d at 107 (stating legal standard where adverse inference is sought on basis that the evidence was not produced in time for use at trial).

        To satisfy the first element of this test, the moving party must show that the respondent breached its obligations, either as set forth in Rule 26, Fed. R. Civ. P., or as provided in court orders regulating discovery.  The "culpable state of mind" element is satisfied by a showing that "a party has breached a discovery obligation … through bad faith or gross negligence [or] ordinary negligence."  Residential Funding, 306 F.3d at 113; see also Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) ("Since Rule 37(c)(1) by its terms does not require a showing of bad faith, we now hold that such a requirement should not be read into the Rule.").  With respect to the third element, a finding that a party breached its discovery obligations in bad faith is sufficient to establish the relevance of untimely produced or destroyed evidence as a matter of law; a finding that a party breached its obligations through gross negligence is "frequently" sufficient.  See Residential Funding, 306 F.3d at 109.

        Where the breach of discovery obligations was merely negligent, the term "relevant" in the context of Rule 37 "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence."  Id. at 108.  The standard of relevance also differs as

between evidence that was destroyed and evidence that was untimely produced.  A party seeking

an adverse inference based on spoliation allegations "must adduce sufficient evidence from

which a reasonable trier of fact could infer that that the destroyed or unavailable evidence would

have been of the nature alleged by the party affected by its destruction."  Id. at 109 (quoting

Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998) (quotations and brackets omitted).

In cases involving spoliated or unavailable evidence, the negligent or willful party bears the risk

that the evidence was adverse to it.  See id. at 108 (quoting Turner v. Hudson Transit Lines, Inc.,

142 F.R.D. 68, 75 (S.D.N.Y. 1991)).  But where, as here, much of the evidence at issue was not

destroyed but untimely produced, an assessment of relevance is possible.  In such cases, the

negligent party should sustain liability for breaching its discovery obligations where such breach

causes injury, but the moving party should not obtain a windfall for uncovering evidence that

would have made little difference in the underlying case.[6]

   B.  Rule 11 Analysis

      i.  The Port Authority

            Zurich denied that the Port Authority was entitled to Additional Insured status,

arguing that because the only Named Insured on the policy binder was WTCP, and because the

Port Authority did not lease the World Trade Center to WTCP, but rather to the Net Lessees, the

endorsement providing additional insured coverage to the "lessor" did not extend coverage to the

Port Authority.  Similarly, because the Net Lessees were not named as Insureds in the policy

binder, the endorsement providing coverage "Where Required Under Contract" failed to extend

coverage, even though the Port Authority was the owner and lessor of the World Trade Center;

---

[6] Westfield and the Port Authority also cite 28 U.S.C. § 1927 as authorizing sanctions in this case.  Because
unnecessary to this decision, I decline to make any findings under this statute, which requires "a finding of conduct
constituting or akin to bad faith."  State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 180
(2d Cir. 2004).

had leased the very premises that were the subject of Zurich's insurance binder; and had

produced the leasing agreement requiring the Silverstein Net Lessees to procure liability

insurance for the Port Authority.  Zurich argued that there was an "absence of evidence that the

parties intended to name the Port Authority as an Additional Insured, and that the Port Authority

was not the lessor of the insured party."  In re Sept 11th Liab. Ins. Coverage Cases, 333 F. Supp.

2d at 121; see also Lewis Aff., Ex. 20 at 19 (Zurich's contentions) ("Zurich is uncertain as to

which entities might have qualified" as insured entities).

On July 7, 2003, Zurich filed its First Amended Complaint.  I subsequently

ordered the parties to set out their respective contentions to narrow and frame the issues.  See

Initial Case Management Order (Aug. 27, 2003).  Zurich's contentions reaffirmed the allegations

of its First Amended Complaint that "the complex web of leases, operating, and management

agreements related to the leasing of the World Trade Center were [not] disclosed to [Zurich]

during the negotiations prior to issuance of the Policies or … at any time prior to September 11,

2001," and that Zurich was unaware of the "relationships or agreements" among the Net Lessees,

WTCP, and the Port Authority that formed the basis of the Port Authority's demand for

coverage.  See Lewis Aff., Ex. 17 ¶¶ 12, 119; Ex. 20 at 16–20.  And, Zurich added, the "Asserted

Insureds," including the Port Authority, had requested coverage "based upon the supposed intent

of the parties never communicated to Zurich during policy negotiations …."  See Lewis Aff., Ex.

20 at 20.  In sum, Zurich disclaimed any intent to provide "Additional Insured" coverage to the

Port Authority.

Before discovery had taken place in this case, and on the basis of the pleadings

alone, the Port Authority moved for judgment pursuant to Rule 12(c), Fed. R. Civ. P.  I held that

I could not strike Zurich's denials and defenses in its Answer because, under the federal rules, I

could not resolve the issues of fact that Zurich had raised, and thus I denied the Port Authority's

Rule 12(c) motion.  I stated, however, that I found Zurich's arguments "unpersuasive" and

"illogical," and suggested that Zurich could not prevail in its denials and defenses of coverage

unless it could present supporting facts in discovery.  In re Sept 11th Liab. Ins. Coverage Cases,

333 F. Supp. 2d at 121–23.  Thomas Brunner, its counsel and the lead lawyer for all the primary

and excess insurance lawyers in the case, represented to me that there would be substantial

evidence to support Zurich's denials and defenses respecting coverage.  At oral argument on the

Port Authority Rule 12(c) motion, he said, "We have plenty of evidence that, believe me, we can

invoke and we have invoked on this issue of whether [the Port Authority is] an additional insured

at all."  Lewis Aff., Ex. 22 (Hearing Tr. at 17–18 (Dec. 23, 2003)).

        Zurich's contentions—that no evidence existed showing the communicated intent

of the parties, and that there had been no communication to it before September 11, 2001 of the

relationships and agreements among the Port Authority, the Named Insured, and the Net

Lessees—were either dishonest, or objectively unreasonable, or the product of a failure to make

reasonable inquiries.  See Cello Holdings, 347 F.3d at 387.  Zurich's contentions were soundly

refuted as soon as deposition discovery began, when the underwriters for the liability policy

testified.  On June 9, 2004, Lynn Maier, the primary underwriter for the general liability policy

testified in part:

> Attorney:  And that was your understanding, isn't that correct, that the
> Port Authority was and is an additional insured under [the policy]?
>
> Maier:  As it reads in this endorsement, yes.
>
> Attorney:  You say as it reads in this endorsement.  This endorsement
> establishes that the Port Authority is an additional insured; isn't that
> correct?
>
> Maier:  As this endorsement reads, they are listed as an additional insured
> – managers or lessor of premises, yes.

Lewis Aff., Ex. 15 (objections omitted).  On September 8, 2004, Dennis Zervos, Zurich's

underwriting manager and Lynn Maier's supervisor, testified as follows:

> Attorney:  Clearly and unambiguously the Port Authority has projections
> as an additional insured under the primary policy … at least as respects the
> operations at the World Trade Center; is that true?
>
> Zervos:  Yes.
>
> Attorney:  And is it also accurate to say that the parties' agreement and
> intention was that the Port Authority was and would be an additional
> insured under the primary policy?
>
> Zervos:  The parties being Craig Simon and – who are the parties you're
> referring to?
>
> Attorney:  The parties being Zurich on the one hand and the Silverstein
> World Trade Center entities on the other.
>
> Zervos:  Yes.

Lewis Aff., Ex. 35 (objections omitted).

These exchanges show that the individuals at Zurich most directly responsible for

drafting the liability policy understood and intended that the "Additional Insured – Managers or

Lessors" endorsement would extend coverage to the Port Authority.  "Although a party's

uncommunicated subjective intent cannot supply the ultimate meaning of an ambiguous contract,

it is quite another thing to hold that such evidence is wholly irrelevant and inadmissible for other

purposes."  SR Int'l Bus. Ins. Co., 467 F.3d 107 at 125.  The underwriters' testimony,

authoritatively acting for Zurich, constitute more than uncommunicated understanding: it

constitutes an admission of the insurance that Zurich intended to underwrite, and of the risk for

which Zurich charged a premium.  At the very least, the underwriters' understanding, even if

uncommunicated, shows that the Port Authority's interpretation of the policy binder was

consistent with the "customary terms of the insurer's own form," id. at 114 (quoting World

Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 170 (2d Cir. 2003)), because the

underwriters were functioning with respect to terms and endorsements consistent with their usual practice. And the Zurich forms eventually produced in discovery supported the underwriters' understanding and intention that the Port Authority was to be the Additional Insured to the Silverstein entities that would be holding leases to the towers of the World Trade Center. See Hametz Decl., Ex. 30 (Zurich document describing "Broad Named Insured Wording"); Hametz Decl., Ex. 15 (policy printed on September 11, 2001, containing "Broad Form Named Insured" endorsement).

Furthermore, with respect to the Silverstein Net Lessees, Zurich knew, at the time it filed the First Amended Complaint and, subsequently its contentions, that the Net Lessees were WTCP subsidiaries or affiliates that had entered into leases with the Port Authority. Zurich knew this from the evidence exchanged by the parties in the spring of 2003, if Zurich had not known the situation precisely before then. See Sanctions Hearing Tr. 36, 42, 46, 50, 67. Despite its knowledge, Zurich stubbornly maintained its position that because the identity of the Net Lessees had not been listed on the insurance binder as the Named Insureds, the Net Lessees could not be the Named Insureds, and the Port Authority could not be an Additional Insured. See Lewis Aff., Ex. 20 at 12–13.

Wiley Rein attorney Thomas Brunner averred in his declaration that he had interviewed Maier and Zervos in January of 2002, early in the case and well before the mediation proceedings. But Brunner omits to state what he and his team learned from these two central protagonists for Zurich. See Brunner Decl. ¶ 5. It appears, if what they told Brunner was consistent with their later deposition testimony, that they were not asked, or did not tell Brunner what they knew, or that Brunner simply "forgot" what he had learned, for Zurich's pleadings and tactics showed no understanding of the "Additional Insured – Managers or Lessors of Premises"

endorsement. The same inconsistencies, or "forgetting," seems also to have taken place with respect to the version of the policy printed for Zurich's Mary Merkel on September 11, 2001, at 9:01 a.m. of that day, for the document became "lost" midst Zurich's delivery of documents to its lawyers, Brunner's staff, only to be found in response to specific prying by adverse lawyers, themselves prompted by various hints in the documents that were produced. The document, at 62 pages in length and clearly important, is not the type of document that inadvertently becomes lost without a trace. Indeed, Mary Merkel noted the importance by making a handwritten note on the cover page of the policy: "pulled from [Zurich computer system] 9-11-2001." By the time of its First Amended Complaint, Zurich had reviewed Merkel's files, see Platt Decl. ¶ 3, and knew, or should have known, of the "Broad Form Named Insured" endorsement.

When all of the evidence cited above is coupled with the already-persuasive terms of the Willis proposal and subsequent July 18, 2001 policy binder, the factual contention that Zurich did not intend to extend "Additional Insured" status to the Port Authority, is objectively without rational basis; indeed, it is utterly lacking in support. Cello Holdings, LLC, 347 F.3d at 388. Simply put, Zurich's position made no sense, because the parties would not have agreed to insure a holding company with no operations and no direct holdings, without an understanding and intent to insure the subsidiary entities that would actually be exposed to premises liability. See Hametz Decl., Ex. 7 (deposition testimony of Zurich employee Mark Elias). Nor has Zurich offered any evidence to the contrary, arguing not that it was right, but that in the absence of evidence, the Port Authority could not prove it was wrong. This approach shielded Zurich from judgment on Port Authority's motion for judgment on the pleadings, but it will not suffice under Rule 11. The Port Authority's motion for sanctions pursuant to Rule 11, Fed. R. Civ. P., is GRANTED.

ii. <u>Westfield</u>

Westfield's position, although strong, is less conclusive than that of the Port

Authority. Westfield has produced evidence that its status was discussed with Zurich

representatives, yet the name "Westfield" does not appear anywhere in the Willis specifications

or in the July 18, 2001 policy binder. The Broad Form Named Insured endorsement shows that

the WTCP subsidiaries were Named Insureds, but Westfield was not a WTCP subsidiary.

Westfield relies, for this motion, on the "Additional Insured Where Required Under Contract"

endorsement, and on the Restated Reciprocal Easement and Operating Agreement, a contract

requiring the Net Lessee's Association to obtain insurance for Westfield. On the existing record,

Westfield presented a strong and ultimately successful claim to Additional Insured status, but not

one that was entirely free from counterargument.[7]

Thus, I find that the factual contentions asserted by Zurich with respect to

Westfield, although not persuasive, cannot be said to have been "utterly lacking in support" or

"objectively unreasonable." As ultimately conceded by Zurich, the intent was there, but I cannot

say that Zurich's contention to the contrary was "utterly lacking in support." <u>Cello Holdings</u>,

347 F.3d at 388. Westfield is not mentioned by name in the July 18, 2001 binder, and the

references in the parties' communications about Westfield were not always consistent or clear.

Westfield, as an independent lessee from the Port Authority, does not fit the conventional status

of an Additional Insured, and the contract obligation on Silverstein's entities under the Restated

Reciprocal Easement and Operating Agreement, is not so easy to understand. <u>See</u> Kelly Decl.,

---

[7] Westfield's opening memorandum of law states a superseded legal standard for evaluating a Rule 11 motion. Quoting <u>O'Malley v. New York City Transit Auth.</u>, 896 F.2d 704 (2d Cir. 1990), Westfield asserted that under Rule 11, an attorney certifies that his submission to the court "is well-grounded in fact…." The 1993 amendments to Rule 11 changed the "standard for imposing sanctions because of written factual contentions submitted to a district court." <u>In re Pennie & Edmonds LLP</u>, 323 F.3d 86, 89 (2d Cir. 2003). Under the post-1993 Rule, an attorney certifies that a factual contention has evidentiary support or, if specifically so identified, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. Fed. R. Civ. P. 11(b)(3).

Ex. 18 (deposition testimony of Craig Simon incorrectly referring to Westfield as a "member," "part," and "minority partner" of Silverstein Properties, Inc.).

The proofs, however, clarify such doubt as may have existed. The proofs show that Craig Simon, the Willis broker, discussed Westfield's status on several occasions with Zurich's representatives, including Dennis Zervos and William Salvatore. During a conversation in April 2001, Zervos wrote the phrase "Westfield – Retail – Out of Chicago." See Hametz Decl., Ex. 1. Underwriting assistant Gladys Fonseca-Matos showed her awareness, and thus Zurich's awareness, that Zurich was asked to insure a separate lessee of the retail space of the World Trade Center by noting, in the margin of the Willis specifications, the existence of both a "building lessor," and a "retail lessor." See Hametz Decl., Ex. 6. The Willis specifications thus made Zurich aware that a lease for the retail space, involving an entity other than WTCP or another Silverstein entity, was intended to be insured. Lynn Maier, Zurich's underwriter, also knew, I find, that a Zurich certificate of insurance was to be provided to Westfield, as Westfield risk manager Nancy had requested, and as appears in Craig Simon's email of July 17, 2001 to Townsend, of which Maier had a copy. And on August 13, 2001, claims representative William Salvatore noted that "Westfield Is On Policy" at a meeting with Simon and Zervos. See Kelly Decl., Ex. 17.

These references show that Zurich was aware that insurance coverage was to be extended to Westfield. The Restated Reciprocal Easement and Operating Agreement, which created the Net Lessees' Association, required the Association to obtain insurance for Westfield, and the "Broad Form Named Insured" endorsement in the Willis submission and in the version of the policy printed for Mary Merkel on September 11, 2001 extends such insurance. On this record, there is no doubt that Zurich intended to provide liability insurance coverage to

Westfield, and Zurich conceded the issue following Westfield's motion for summary judgment. But the outcome from proofs on the merits does not necessarily dictate the outcome from proofs under Rule 11. Zurich's factual contentions in relation to Westfield are not "utterly lacking in support," and Westfield's motion for sanctions pursuant to Rule 11, Fed. R. Civ. P., is DENIED.

C. <u>Rule 37 Analysis</u>

The Port Authority's and Westfield's motions for sanctions pursuant to Rule 37, Fed. R. Civ. P., are similar. Each had demanded that Zurich produce documents pursuant to Rules 26 and 34, and each argues that Zurich failed timely to produce such documents. To succeed on their motions, each must establish (1) that Zurich had control over the documents and had an obligation to produce them; (2) that Zurich failed timely to produce the evidence with 'a culpable state of mind'; and (3) that the untimely produced documents were 'relevant' to their claims or defenses. <u>See</u> <u>Residential Funding</u>, 306 F.3d at 107. The Port Authority also alleges that Zurich destroyed, or permitted to be destroyed, evidence of its customary terms and endorsement forms, which may affect the scope of coverage afforded to PATH. <u>See</u> Port Auth. Mem. at 38–39; Sanctions Hearing Tr. 55–58. Because the issue of scope was voluntarily dismissed from this case and is no longer before me, <u>see</u> Order Dismissing Claims for Mootness (Jan. 18, 2007), I decline to rule on the issue of sanctions relating to the Port Authority's spoliation allegations.

In fall of 2003, the Port Authority and Westfield served their document demands. Among other things, the Port Authority sought "all versions or drafts of the Zurich Policies, including … any … endorsement;" all documents concerning the drafting, meaning, interpretation or application of key policy terms; and all documents concerning the drafting, meaning, interpretation, or application of an endorsement referred to as an "Additional Insured – Managers or Lessors of Premises" endorsement, available to Zurich for use in liability insurance

policies, including underwriting and claims manuals.  See Lewis Aff., Ex. 29 (Document

Request Nos. 1, 5).  Similarly, Westfield sought "[a]ll documents concerning [Zurich's]

Coverage of the World Trade Center Complex;" "[a]ll documents … concerning the World

Trade Center Liability Coverage program;" and "[a]ll underwriting manuals, claims manuals,

and other documents concerning guidelines, policies, practices, or procedures developed or

employed by Zurich with respect to underwriting of commercial liability insurance."  See

Westfield Mem. at 19 (quoting document demands).

By order dated March 3, 2004, in the context of the Port Authority's and

Westfield's complaints of slow and inadequate responses by Zurich, I directed the parties to

complete document production by March 19, 2004.  See Order (Mar. 3, 2004).  Zurich made

fourteen separate productions thereafter, each untimely by the terms of the March 3, 2004 order.

Most significantly, Zurich did not produce, until February 18, 2005, the 62-page document that

had been printed for Mary Merkel on September 11, 2001, nor the "Broad Form Named Insured"

endorsement that was part of that document.  Zurich also failed to produce, until September 29,

2004 and November 3, 2004, certain underwriting guidelines and forms bearing on the meaning

of the Broad Form Named Insured endorsement and the Additional Insured endorsements.  See

Lewis Aff., Exs. 9, 33, 34.  These documents—the 9/11 Document and the underwriting

guidelines and forms—were clearly responsive to Westfield's and the Port Authority's document

demands, and for the reasons discussed above and below, they were clearly relevant within the

meaning of Rule 37.

Zurich's "culpable state of mind" is established by evidence that it intended to

delete, and deleted, the electronic version of the 9/11 Document, and by evidence that Zurich or

its attorneys, or both, had possession of the printed version of the 9/11 Document, but failed to

produce it.  The email of January 11, 2001 from Lynn Maier to Dorothy Kelly, Gloria Fonseca-Matos, and Dennis Zervos shows Zurich's affirmative intent to delete the 9/11 Document from its files, and to confirm that deletion to Mary Merkel in the home office.  See Hametz Decl., Ex. 21.  Maier's email constitutes clear evidence of Zurich's violation of discovery obligations.  The fact that, separately, Zurich's attorneys may have instructed a litigation hold is not relevant.

Zurich eliminated the electronic version of the policy as it existed on September 11, 2001, but fortunately, the policy persisted in paper form in Mary Merkel's files in Illinois. Wiley Rein attorneys obtained and copied the 9/11 Document in March of 2003, but they left it buried in a box for nearly two years and failed timely to produce it.  Counsel's failure to recognize the importance of this document, and to produce it timely, especially when alerted to its possible existence by opposing counsel, also constitutes a violation of discovery obligations. Indeed, at the sanctions hearing on April 19, 2007, counsel for Zurich properly conceded that it should have been produced, attributing Zurich's failure to produce it to "inadvertence."  See Sanctions Hearing Tr. 62–64.  The explanation is not apt.  A finding of negligence or worse would appear to be a more appropriate characterization, and I so find.

The Port Authority and Westfield have carried their burden with respect to each of the three elements of a motion for sanctions pursuant to Rule 37(c)(1), Fed. R. Civ. P., and the motions are GRANTED.  I turn now to the appropriate sanctions award under Rule 11 with respect to the Port Authority, and under Rule 37 with respect to the Port Authority and Westfield.

D.  Amount of Sanctions

i.  Rule 11

A sanction imposed for violation of Rule 11 "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(2).  If the sanctions are imposed pursuant to a party's motion, and if "warranted for

effective deterrence," the court may direct "payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." <u>Id.</u>  A sanction must be proportioned to the public interest in the affected proceedings, and bear relation to the amounts involved.  Here, public interest in fair adjudication was at its peak, and the amounts at stake were very large.  Zurich had agreed to provide aggregate commercial liability coverage in the amount of fifty million dollars, <u>see</u> <u>In re Sept. 11th Liab. Ins. Coverage Cases</u>, 458 F. Supp. 2d at 109, and as lead insurer, it also had an obligation to excess insurance carriers providing aggregate coverage of one billion dollars "to get it right."  <u>See</u> Sanctions Hearing Tr. 18 (Mr. Coughlin).

      The pleadings and implementing Statement of Contentions were crucial in relation to my management of this case.  The parties were so advised, frequently, at case management conferences and otherwise, and seemingly endeavored to comply.  The pleadings and contentions were the bases of Rule 12 motions, and Zurich's improper pleadings were the reasons that I could not fairly determine the issues tendered to me at the time.  Clearly, Zurich's decision to assert and maintain its denials and defenses regarding the Port Authority's status as Additional Insured multiplied proceedings, caused substantial expense to the parties, caused substantial waste of court time, and insulted public and judicial expectations of the standard of conduct expected of attorneys and insurance carriers.  I note also the intense public interest in the 9/11 liability cases, all of which are before me, and the integral involvement of the insurance liability cases in their overall resolutions.  <u>See</u> Air Transportation Safety and System Stabilization Act of 2001 § 408(a) (limiting liability of person with a property interest in the World Trade Center to an amount not greater than the limits of liability insurance coverage maintained by that person).  Zurich, as the lead insurer on the case, and its attorneys, as lead

counsel in the proceedings before me, owed the Court and the public better conduct than the conduct described herein; at a minimum, they had a duty to comply with Rule 11 of the Federal Rules of Civil Procedure. And, having multiplied proceedings by asserting denials and defenses that could not be supported by the evidence, the conduct of Zurich and its counsel, in their efforts to do away with evidence, to not produce evidence, and to slow up production of evidence until its utility might be attenuated, compounded the wrongdoing that they perpetrated.

These considerations, and the conduct of Zurich and of Zurich's attorneys, warrant a Rule 11 sanction in a substantial amount. I believe that a sanction of $750,000 is appropriate, of which half shall be applied to reimburse the Port Authority for extra attorneys' expenses they incurred. The amount is large, but not so large as to be disproportionate to the strong public interest, the waste caused to judicial and attorney resources, and the amounts at stake in the litigation. District courts have imposed considerably higher amounts, see GREGORY P. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE § 3(b) (3d ed. 2000) (listing "top ten reported federal monetary sanctions"), although sanctions exceeding $1,000,000 are rare. In this case, involving important and large insurance companies and law firms, a smaller award would be insufficient to deter future misconduct, or similar conduct by those similarly situated. Although the conduct in this case is not as egregious as that described in some of these high-sanction cases, see e.g., Chambers v. Nasco, 501 U.S. 32 (1991) (sustaining $996,644.65 sanction), the conduct giving rise to sanctions and other relevant considerations support the amount I fix. Because the record does not make clear which of Zurich, Wiley Rein LLP, and Coughlin Duffy LLP should bear greater or lesser proportional liability for the Rule 11 violations identified in this opinion, the sanction is imposed jointly and severally against all three, subject to request by any of these parties for a more exacting review and allocation.

ii.  <u>Rule 37</u>

Upon finding that the moving party has carried its burden under Rule 37, Fed. R. Civ. P., the court should endeavor to impose a sanction that will restore the parties to the position they would have occupied but for the breach of discovery obligations and deter future misconduct.  <u>See</u> <u>Zubulake</u>, 229 F.R.D. at 437.  Appropriate sanctions may include "payment of reasonable expenses, including attorney's fees, caused by the failure" to disclose.  Fed. R. Civ. P. 37(c)(1).  Where the parties have settled the issue as to which the undisclosed information pertained, as they have in this case, reimbursement for the expense of unnecessary litigation caused by the failure to disclose is the most appropriate sanction.

I find that Zurich's and its counsel's failure to disclose the 9/11 Document and relevant underwriting guidelines and forms caused unnecessary litigation, and compounded their Rule 11 violations.  The 9/11 Document, in particular, showed Zurich's understanding and intent that the WTCP subsidiaries were to be named insureds on the policy.  Even though this document was created post-binder, it shows Zurich's knowledge and intent, and how Zurich's customary forms gave meaning to the terms of the policy binder.  Zurich's and its attorneys' delays and destructions multiplied proceedings and caused undue time and expense.

The Port Authority seeks $2,086,787 for the time its Law Department and outside counsel litigated the issue of Additional Insured status.  Of this amount, it attributes $407,837 to in-house counsel, who did not keep contemporaneous time records.  Westfield seeks $2,979,021 for the time its lawyers—a larger team billing at higher rates—litigated the issue of Additional Insured status.

Rule 37 sanctions are intended to restore the parties to the position they would have occupied but for the breach of discovery obligations.  I find, however, that precision in determining what amounts of time the parties devoted to this issue, separate from all other issues,

is not possible. My review of a significant sample of time entries reveals that the moving parties' attorneys did not, and likely could not, separate their time records by the issue in contention. Much of the parties' considerable time seems to have been devoted to a separate set of issues—whether Zurich lawfully could exclude coverage of defense costs from the liability policy it issued, and whether the parties intended such exclusions—issues that I twice resolved in favor of Zurich. See In re Sept. 11th Liab. Ins. Coverage Cases, 458 F. Supp. 2d 104; 333 F. Supp. 2d 111. Although the lawyers represent that their accounting for fees and expenses separates the different sets of issues, my own review suggests that the separations were not based on discrete mentions, and are subject to a large component of arbitrariness and unreliability. In substantial part, the issues were prosecuted simultaneously in discovery, and separation of time by issue would be very difficult.

Therefore, I exercise my discretion to reduce their requested attorneys' fees by a flat and sizeable amount, see Eastway Constr. Corp. v. City of New York, 821 F.2d 121, 123 (2d Cir. 1987); Estate of Calloway ex rel. LMN Prods. v. Marvel Entertainment Group, 9 F.3d 237, 241 (2d Cir. 1993), and I impose Rule 37 sanctions in the amount of $500,000. Of this amount, $250,000 shall be payable to the Port Authority, and $250,000 to Westfield, to defray the costs they unreasonably incurred in the wasted discovery proceedings. The sanction is imposed jointly and severally against Zurich, Wiley Rein LLP, and Coughlin Duffy LLP, subject, as with the Rule 11 sanction, to review and re-allocation at the request of any of them. The sanction is additive of the sanction imposed pursuant to Rule 11, for a total sanction of $1,250,000.

## III.    Conclusion

For the foregoing reasons, the Port Authority's motion for sanctions pursuant to Rule 11, Fed. R. Civ. P. is GRANTED; Westfield's motion for sanctions pursuant to Rule 11,

Fed. R. Civ. P. is DENIED; the Port Authority's motion for sanctions pursuant to Rule 37, Fed. R. Civ. P. is GRANTED; and Westfield's motion for pursuant to Rule 37, Fed. R. Civ. P. is GRANTED.

I am not able on the record before me to apportion the sanction among Zurich, Wiley Rein LLP, and Coughlin Duffy LLP. On or before July 6, 2007, any one of them may request a conference to discuss the subject of allocation. If none of the parties timely makes such a request, the allocation shall remain joint and several.

Because the parties wished to preserve the confidentiality of their attorneys' time records, those records have not been docketed. See Order Regulating Filings, Mar. 8, 2007. Having reviewed the time records, I find that Westfield and the Port Authority have not demonstrated that "justice requires" filing such records under seal in order "to protect [them] from annoyance, embarrassment, oppression, or undue burden or expense," Fed. R. Civ. P. 26(c), and I therefore deny the parties' requests for filing such records under seal. I am also unable to agree to the parties' claim of attorney-client privilege and work product privilege, for the sample of records that I reviewed do not support the parties' claim. However, I grant Westfield and the Port Authority leave, within ten days, to file further submissions in support of their Rule 26(c) claims or claims of privilege.

The Clerk shall accept the parties' time records for filing in paper form.

SO ORDERED.

Date:      June 18, 2007
           New York, New York

                                    ALVIN K. HELLERSTEIN
                                    United States District Judge